*475 GRIFFIS, J.,
Concurring in Part, Dissenting in Part:
¶ 15. I concur with the majority’s decision to reverse and remand this case for further proceedings on the matter of Rachel’s visitation rights. I dissent from the majority’s reasoning and decision on the modification issue.
¶ 16. The majority has addressed only three issues presented to this Court by the parties. I am of the opinion that the Court should have addressed all of the issues presented. Rachel presented the following issues for review:
(1) Did the chancellor err by applying a subjective, personal standard of fairness in overruling Rachel’s motion for recusal, rather than the objective, reasonable person standard that is required?
(2) Did the chancellor err by placing the burden of proof on Rachel (rather than on Tim as the party seeking modification), to prove that she had primary physical custody and the rights that go with it regarding relocation by the primary custodial parent?
(3) Did the chancellor err by not applying the traditional three-part legal standard for modification, and holding Tim to his burden as the moving party to satisfy each element of the three-part test?
(4) Under the “impractical/impossible” legal standard that the chancellor employed for modification, was the chancellor manifestly wrong in concluding that joint custody was “im-practieal/impossible” when both parties submitted proposals for continued joint custody and Tim’s proof was that he could continue to exercise joint custody in Memphis and Rachel could exercise continued joint custody in Jackson?
(5) Did the chancellor err in denying Rachel’s Rule 60(b) motion to set aside the judgment, when (a) the chancellor found as a fact that the best interests of the children were served by the existing joint custody arrangement; (b) he modified the existing joint custody arrangement based solely upon Rachel’s anticipated move to Memphis; and (c) the move to Memphis never occurred as a result of events which transpired after trial, and over which Rachel had no control?
(6) Did the chancellor err by modifying the previously existing judgment of child support where neither party in their pleadings requested modification, where Tim expressly disavowed any claim for child support, where neither party presented any evidence on the issue of child support, and where the chancellor made no factual findings to support a child support award?
(7) Did the chancellor err by failing to give his reasons for rejecting the guardian ad litem’s recommendation that the children be allowed to remain in Rachel’s primary custody?
¶ 17. The majority does not address the Rule 60(b) motion, the child support, or the chancellor’s decision to reject the guardian ad litem’s recommendation. The majority only briefly addresses the appropriate legal standard that is applicable to child custody modification actions. I will address the child custody, the motion for recusal, and the visitation issues and then address several other issues.

(1) Child Custody

¶ 18. The majority defines the issue as a consideration of the chancellor’s finding that Rachel’s anticipated move “would be *476 an adverse material change sufficient to necessitate an Albright analysis.” If indeed, it is as the majority asserts that Tim was required to establish a material change of circumstances that adversely affected the children, then I am of the opinion that there was not sufficient evidence to support this finding. Indeed, I am of the opinion that there was sufficient evidence to establish that the anticipated move to Memphis was a material change of circumstances, but not to establish that the anticipated move would adversely affect the children. Therefore, I respectfully dissent.
¶ 19. I also disagree with the standard discussed and applied by the majority, as well as in other appellate court decisions by the Mississippi Supreme Court and this Court. I am of the opinion that the “adverse effect” consideration is not appropriate where the parties have joint physical custody. Without the requirement that Tim establish an “adverse effect” on the children, then I would find that the chancellor did have sufficient evidence to modify custody from joint physical custody to sole physical custody in Tim based solely on the statutory provisions that allow joint physical custody.
¶ 20. I will try to explain further. In their divorce, the parties agreed to a joint legal and physical custody arrangement for their children. Mississippi Code Annotated section 93-5-24 (Rev.2004) provides in part:
(2) Joint custody may be awarded where irreconcilable differences is the ground for divorce, in the discretion of the court, upon application of both parents.
(4) There shall be a presumption that joint custody is in the best interest of a minor child where both parents have agreed to an award of joint custody.
(5)(a) For the purposes of this section, “joint custody” means joint physical and legal custody.
(b) For the purposes of this section, “physical custody” means those periods of time in which a child resides with or is under the care and supervision of one (1) of the parents.
(c) For the purposes of this section, “joint physical custody” means that each of the parents shall have significant periods of physical custody. Joint physical custody shall be shared by the parents in such a way so as to assure a child of frequent and continuing contact with both parents.
(d) For the purposes of this section, “legal custody” means the decision-making rights, the responsibilities and the authority relating to the health, education and welfare of a child.
(e) For the purposes of this section, “joint legal custody5’ means that the parents or parties share the decision-making rights, the responsibilities and the authority relating to the health, education and welfare of a child. An award of joint legal custody obligates the parties to exchange information concerning the health, education and welfare of the minor child, and to confer with one another in the exercise of decision-making rights, responsibilities and authority.
An award of joint physical and legal custody obligates the parties to exchange information concerning the health, education and welfare of the minor child, and unless allocated, apportioned or decreed, the parents or parties shall confer with one another in the exercise of decision-making rights, responsibilities and authority.
*477 (6) Any order for joint custody may be modified or terminated upon the petition of both parents or upon the petition of one (1) parent showing that a material change in circumstances has occurred.
(7) There shall be no presumption that it is in the best interest of a child that a mother be awarded either legal or physical custody.
¶ 21. On September 8, 2000, the parties executed a Child Custody, Child Support and Property Settlement Agreement. On October 4, 2000, the chancellor entered a Final Judgment of Divorce. The parties’ Child Custody Agreement provided:
XIX. CHILD CUSTODY
A. The parties shall have joint physical custody with Wife awarded physical custody of the minor children; Husband shall have secondary physical custody of the minor children; the parties shall have joint legal custody of the minor children.
B. Joint physical custody means that each of the parents shall have significant periods of physical custody and it shall be shared by the parents in such a way so as to assure a child a frequent and continuing contact with both parents.
The parties’ agreement distinguishes between “physical custody” to Rachel and “secondary physical custody” to Tim, but it does not define these terms. The agreement then included over four pages of visitation provisions. The agreement also included the following:
F. In the event either parent moves from the Jackson Metropolitan area, that event shall constitute a material change in circumstances.
The agreement defined joint physical custody consistent with the statutory definition in Mississippi Code Annotated section 93 — 5—24(5)(c): “ ‘joint physical custody[1] means that each of the parents shall have significant periods of physical custody ... [and it] shall be shared by the parents in such a way so as to assure a child of frequent and continuing contact with both parents.”
¶22. In late December 2005, Rachel’s husband, Dan Spivey, accepted a job in Memphis, Tennessee. Rachel’s attorney, Mark Chinn, correctly advised her that under the terms of the Child Custody Agreement she had the right to relocate with the children. Thereafter, Dan accepted the position and commuted from Memphis and the family home in Jackson. Rachel remained in Jackson with the children to make arrangements for the move to Memphis once the children’s school year ended in May 2006. Rachel and the children anticipated a move but never moved from Jackson.
¶ 23. In January 2006, upon learning that Rachel planned to move to Memphis, Tim filed an Emergency Motion for Temporary Restraining Order and/or Alternative Injunctive Relief. The chancellor heard the parties’ attorneys’ arguments and entered a temporary restraining order which prohibited Rachel: “from taking the children to Memphis to become involved in community activities such as church and school; ... from showing the children potential houses in Memphis that may be purchased; ... [and] from taking the children to visit any schools in the Memphis area.”[1]
*478 ¶ 24. On February 28, 2006, Rachel filed her Petition to Modify Defendant’s Periods of Physical Custody. In her petition, Rachel did not seek a change in the custodial arrangement. She only asked for a revision of the parties’ custodial/visitation periods. She asked the court to “modify the custodial/visitation periods in light of the logistical change in circumstances, and to provide Tim with frequent and continuing contact with the minor children in light of the circumstances.”
¶ 25. On April 19, 2006, Tim filed his Answer to Petition to Modify Defendant’s Periods of Physical Custody and Counter-Petition for Modification of Physical Custody. In his counter-petition, Tim requested sole physical custody and asserted that: (1) Rachel’s move from Jackson to Memphis would constitute a material change in circumstances; (2) the move would be detrimental to the children; and (3) it would be in the children’s best interests to remain in Jackson rather than move to Memphis.
¶ 26. The majority notes the fact that the Mississippi Supreme Court has called the legal standard for a modification of child custody both a two-part test (Touchstone v. Touchstone, 682 So.2d 374 (Miss.1996)), and a three-part test (Mabus v. Mabus, 847 So.2d 815 (Miss.2003)). There is no substantive difference in the legal standard applied in an ordinary child custody modification proceeding where one party has sole physical custody. The only real difference is whether you count the “adverse effect” portion as a separate element of the standard.
¶ 27. The only evidence of “adverse effect” on the children was Tim’s testimony that they would be traumatized by the move. This rationale was not accepted by the supreme court in Spain v. Holland, 483 So.2d 318 (Miss.1986). Indeed, there the court reasoned:
We need be clear what we mean by the phrase “adverse effect[.]” These children have already been adversely affected by the inability of their mother and father to live together which led to the 1983 divorce. Beyond this, most children of divorced parents will be further adversely affected if the two parents are living in the same town at the time of the divorce and either subsequently moves thousands of miles away. Where such occurs we solve nothing by shifting custody to the parent staying at home for, in theory at least, a transcontinental separation from either parent will adversely affect the child. The judicial eye in such cases searches for adverse effects beyond those created (a) by the divorce and (b) by the geographical separation from one parent.
We close our eyes to the real world if we ignore that ours is a mobile society. Opportunity and economic necessity transport perfectly responsible adults many miles from their homes. In this context, almost seventeen years ago we found no material change in cireum- *479 stances when a custodial parent moved 600 miles to San Antonio, Texas. Brocato v. Walker, 220 So.2d 340, 844 (Miss.1969). Only last year we refused to interfere with a Coast Guard officer custodial father’s taking his children to his new station in Hawaii. Pearson v. Pearson, 458 So.2d 711, 713 (Miss.1984). We regard as legally irrelevant to the matter of permanent custody the fact that taking the children to a distant state effectively curtails the noncustodial parent’s visitation rights.
This Court has never directly confronted a noncustodial parent’s objection to the custodial parent’s taking the children outside of the United States and to a foreign nation. But see, Turner v. Turner, 331 So.2d 903 (Miss.1976). We find, however, that other states have faced this problem and have by and large refused to interfere with such international changes of residence, [citations omitted]
Allen Holland’s assignment to England for a four[-]year tour of duty represents a legitimate professional opportunity. If we find no per se basis for interference with a custodial Coast Guard father’s taking his children to our sister state of Hawaii, Pearson v. Pearson, 458 So.2d at 713, it is difficult to divine any rationale upon which we might interfere with an Air Force father’s taking his children to our mother state of England, notwithstanding the necessity of our forcible emancipation from that mother state some 210 years ago.
By way of clarification, we recognize today that a custodial parent’s taking his or her children to a foreign nation does not per se visit an adverse impact upon the children so as to require a change of custody to the parent remaining stateside. We do not foreclose the consideration by our trial courts of peculiar or unusual circumstances adversely affecting the children over and above the effect attendant upon the mere increase in miles between the children and the noncustodial parent.
Spain, 483 So.2d at 320-21. Accordingly, the move alone is not sufficient to establish an adverse effect under the modification standard.
¶28. The chancellor ordered that a guardian ad litem be appointed. Attorney Debra Allen was appointed and conducted a thorough investigation. Allen testified that in her opinion the best interest of the children would be served by allowing the children to move to Memphis with Rachel and giving Tim substantial periods of time to visit with the children. Allen testified that the children were happy, well-adjusted, and doing extremely well in the existing custody arrangement. She lamented the fact that any change had to be made. Allen concluded that with Rachel in Memphis, and Tim in Jackson, the children would be better served living in Memphis with Rachel.
¶ 29. As long as the courts of this state require that a parent with “joint physical custody” must prove an “adverse effect” on the children, I am of the opinion that the chancellor and this Court have incorrectly decided this case. Tim did not present sufficient evidence to establish that the children would suffer an actual adverse effect by a relocation to Memphis. Therefore, I dissent from this decision.
¶ 30. Nevertheless, I believe the majority and the chancellor applied the incorrect legal standard. I am of the opinion that if the Mississippi Supreme Court would consider this matter based on the proper standard, Tim did prove that the proposed move to Memphis was sufficient to be a “material change of circumstances.” As such, under Mississippi Code Annotated section 93-5-24(6), that showing would be *480 sufficient to authorize the chancellor to modify custody.
¶ 31. The Mississippi Legislature made “joint physical custody” available by enacting Mississippi Code Annotated section 93-5-24. The specific language of section 93-5-24(6) actually sets a lower standard for modification between parents who have joint physical custody than in a situation where one parent is granted sole physical custody. Indeed, the words “adverse effect” are not even mentioned in the statute.
¶ 32. Mississippi Code Annotated section 93-5-24(6) provides:
Any order for joint custody may be modified or terminated upon the petition of both parents or upon the petition of one (1) parent showing that a material change in circumstances has occurred.
(Emphasis added). Hence, I cannot find the legal basis that requires that the parent’s petition must show an “adverse effect” on the children. Indeed, Tim, as a parent with joint physical custody, must only show “that a material change of circumstances has occurred.” Under this statutory standard, Rachel’s move to Memphis would suffice to allow the chancellor to move to the Albright analysis.
¶ 33. As discussed above, the supreme court in Spain determined that a geographical move by the custodial parent may be sufficient to establish a material change of circumstances, but be insufficient to prove that the move adversely affected the children. Spain, 483 So.2d at 320-21. In Franklin v. Winter, 936 So.2d 429, 432(¶ 11) (Miss.Ct.App.2006), this Court held:
According to recent cases, the moving of one party some distance away can constitute a material change in circumstances sufficient to warrant the modification of a custody agreement when the parties at issue share joint physical custody of the child, as is the case in the case at bar. Since we have found that the record establishes that the parties shared joint physical custody, we find that the chancellor in this case did not err in finding that Franklin’s move to Arkansas constitutes a material change that makes the sharing of joint physical custody of Shanna unworkable. Although the chancellor in this case spent much time focusing on the factors found in Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983), the chancellor also addressed the material change necessary in order to alter the custody order. After reviewing all the evidence presented, the court found that it was in Shanna’s best interest for primary physical custody to be granted to her father. We cannot say that the chancellor’s conclusion was “clearly erroneous” or applied “an erroneous legal standard.” Therefore, we affirm the chancellor’s grant of custody to Franklin.
¶ 34. The majority has decided this case and written its opinion as if this were an ordinary child custody modification action. I do not believe it is. In fact, I think that this case indicates a clear conflict between the law as enacted by the Mississippi Legislature and the interpretation of the law by the Mississippi Supreme Court. I am of the opinion that the Mississippi Supreme Court should consider this matter and resolve this conflict. Until then, based on the majority’s opinion, I must respectfully dissent.

(2) Recusal of Trial Judge

¶ 35. I disagree with the majority’s analysis on this issue. I believe that the essence of justice requires this Court to address any error that is premised on the *481 failure of a chancellor to recuse.[2]
¶ 86. Rachel filed a motion for recusal requesting that the chancellor recuse himself based on the fact that Tim’s wife, Samantha Thomas Porter, routinely practiced in the field of family law before both chancellors and was an important witness in the custody determination.
¶ 37. In Robinson v. Irwin, 546 So.2d 683, 685 (Miss.1989), the Mississippi Supreme Court observed that: “Most chancellors adhere to an unwritten rule not to hear the personal divorce suits of lawyers who routinely practice before their courts.” The supreme court also stated that: “This Court commends such a practice, and it would be wise for appointing authorities and local lawyers to adhere to such practice.” Id. (quoted with approval in Steiner v. Steiner, 788 So.2d 771, 775(¶ 10) (Miss.2001)). In this case, the chancellor specifically noted that the “[Chancery Court of Madison County] adheres to this practice.”
¶ 38. This “unwritten rule,” which has been commended by our supreme court, promotes confidence in the judiciary and our court system in divorce cases by the non-lawyer spouse who may understandably harbor doubts about the chancellor’s impartiality in such circumstances. Rachel contends that the reasons for the rule apply with no less force in emotionally charged contested custody cases such as this where the lawyer-party is also married to a lawyer who routinely practices in this particular chancery court district before both chancellors.
¶ 39. The record in this case established that Samantha, Tim’s current wife, had cases pending before Judge Lutz and the other chancellor of the district. Rachel contends that Samantha specialized in family law and was listed as attorney of record in twenty-three cases on the chancery dockets of Madison and Yazoo Counties. According to Samantha’s own affidavit, fourteen of the cases were assigned to Judge Lutz, and nine were assigned to Judge Goree. Two estate matters were actively pending before Judge Lutz at the time the motion for recusal was filed.
¶ 40. The standard for judicial recusal is established in the Code of Judicial Conduct. Canon 3(E)(1) of the Code of Judicial Conduct states: “Judges should disqualify themselves in proceedings in which their impartiality might be questioned by a reasonable person knowing all the circumstances .... ” In Dodson v. Singing River Hospital System, 839 So.2d 530, 532-33(¶ 9) (Miss.2003), the supreme court stated, “we have held consistently that the objective ‘reasonable person knowing all of the circumstances’ is the proper standard” for determining whether a recusal is warranted. So long as the judge applies the correct legal standard, the decision is discretionary, but “[a] judge is required to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality.” McFarland v. State, 707 So.2d 166, 180(¶ 52) (Miss.1998) (emphasis added).
¶ 41. Here, the chancellor considered his personal feelings and experiences regarding Samantha. The chancellor opined that since he did not know Samantha personally, and because her practice before him was primarily ex parte rather than contested, he would not harbor any preconceived notion that might interfere with his impartiality. In other words, he felt that he could be fair. He went on to state *482 that he might feel differently if the two lead lawyers were similarly situated since he had formed personal opinions of respect and trustworthiness for them. Rachel argues that the chancellor deviated from the objective reasonable person standard and instead relied on his subjective view of Samantha.
¶ 42. The majority agrees that the ex parte nature of Samantha’s practice resolves this matter. I do not see a distinction between an attorney who appears before a judge on ex parte matters as opposed to litigated matters. The problem that I have with this issue is that Judge Lutz did not recuse himself from this case, but he did recuse himself in the two other cases that Samantha had pending before him and ordered the clerk to assign Samantha’s future cases to Judge Goree during the pendency of this action. In my opinion, the decision to recuse himself in Samantha’s other cases indicates that Judge Lutz struggled with the question of whether his impartiality could be reasonably questioned.
¶ 43. Judge Lutz did not solve the problem of an appearance of impropriety by disqualifying himself from hearing Samantha’s other cases. In fact, in my opinion, this created a problem. If there were grounds to recuse from future cases brought by Samantha, then I am of the opinion that it could cause a reasonable person, knowing all the circumstances, to question the judge’s impartiality in the existing case. However, if this matter were remanded, the recusal issue would be moot since the chancellor in issue has since retired.

(3) Visitation Rights

¶ 44. I agree with the majority that the chancellor should reconsider the visitation rights since the order was based on Rachel’s anticipated move to Memphis, which never occurred. However, I am also of the opinion that this matter should be considered by this Court as part of the evaluation of the chancellor’s denial of Rachel’s Rule 60 motion.
¶ 45. My view notwithstanding, I do not see the legal basis for the majority’s opinion on this issue. My legal basis is that I am of the opinion that the Rule 60(b) motion was erroneously denied.

(í) Rule 60(b) Motion

¶ 46. The majority has failed to consider Rachel’s assignment of error under Rule 60(b) of the Mississippi Rules of Civil Procedure. I think this is a tremendous mistake and is, in fact, the most important and legally intriguing question presented in this case.
¶ 47. While the post-trial motions were pending, Rachel’s husband’s employment in Memphis was involuntarily terminated. On August 30, 2006, Rachel filed a Motion for Relief from Judgment pursuant to Rule 60(b) of the Mississippi Rules of Civil Procedure. Rachel asked the court to set aside the final judgment and reinstate the joint custody arrangement since the loss of Dan’s job meant that Rachel would not be moving to Memphis as everyone had expected. The motion was denied by the chancellor.
¶ 48. The essence of this action is that you have two parents who have put aside their differences and were working with a shared visitation arrangement. The chancellor praised both Tim and Rachel. The chancellor also praised the existing joint custody arrangement and the many benefits and advantages the children enjoyed as a result of that arrangement. In the opinion, the chancellor stated:
Both Rachel and Tim are exceptional parents. They have different parenting styles which [have] only made the cur *483 rent joint custody arrangement that much more unique. These children have enjoyed the best of both parenting styles....
The court’s decision was difficult in this case, as the children have, until Rachel’s impending move, been blessed with having two full-time parents. This is one of those rare occasions where, until now, the children have felt little impact from the divorce.
These children were fortunate in that they experienced two full-time parents who were fully committed to them. Due to Rachel’s impending move, this is no longer a privilege that these children will enjoy.
The court is convinced that there is no equivalent substitute to having both parents available twenty-four (24) hours a day. And that is what the Porter children have enjoyed thus far.
At one of the final hearings, the chancellor referred to the joint custody arrangement as “ideal” and “[bjest I have ever seen.”
¶49. During the trial, Tim repeatedly testified about the benefits to the children of the existing custody arrangement. Tim’s entire request for a modification was that the children would suffer “trauma” by being separated from either parent. Tim’s attorney told the court:
They [the children] have two homes with routines, with special places, with rooms, with pets. They have special things that they do with their parents.
They have, actually, been the lucky children of divorce, who post divorce have been able to live with both their parents. They didn’t have to separate from one parent. And I think the evidence that you’re going to hear will show that they have really thrived under this circumstance. So, now, they’re not going to be able to do that any more, and the reason they won’t be able to is because Rachel has made a choice to move with her husband.
¶ 50. Hence, with the termination of Rachel’s husband’s employment in Memphis and their family not leaving Jackson, the reasons to modify custody were no longer present. Rachel filed a Rule 60(b) motion for relief from the judgment.
¶ 51. Rule 60(b) of the Mississippi Rules of Civil Procedure provides in relevant part as follows:
(b) Mistakes; Inadvertence; Newly Discovered Evidence; Fraud; etc. On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:
(5) ... it is no longer equitable that the judgment should have prospective application;
(6) any other reason justifying relief from the judgment.
Rule 60(b) is often referred to “as ‘a grand reservoir of equitable power to do justice in a particular case.’ ” Briney v. U.S. Fid. & Guar. Co., 714 So.2d 962, 966(¶12) (Miss.1998).
¶ 52. The factors to be considered when deciding if relief should be granted under Rule 60(b) are as follows:
(1) That final judgments should not lightly be disturbed; (2) that the Rule 60(b) motion is not to be used as a substitute for appeal; (3) that the rule should be liberally construed in order to achieve substantial justice; (4) whether the motion was made within a reasonable time; (5) [relevant only to default judgments]; (6) whether — if the judgment was rendered after trial on the merits — the movant had a fair opportunity to present his claim or defense; (7) *484 whether there are intervening equities that would make it inequitable to grant relief; and (8) any other factors relevant to the justice of the judgment under attack.
Briney, 714 So.2d at 968(¶20) (citation omitted). Here, I believe the majority should have reviewed this appeal based on Rule 60(b). Based on these elements and the facts as applied, it appears that justice would require the judgment be set aside.
¶ 53. Child custody judgments are never final judgments and are always subject to modification. In light of the chancellor’s findings that the existing joint custody arrangement was in the children’s best interests, and only modified that arrangement as a result of Rachel’s anticipated move, it seems that the chancellor should have been delighted to have an opportunity to put the children back in an arrangement that worked so well.
¶ 54. Rachel’s Rule 60(b) motion was not used as a substitute for appeal. It was based on Dan’s termination, which occurred after the trial. Dan’s termination could not have served as the basis for an appeal. It also could not have served as the basis for a new trial since Dan’s termination occurred after the ten-day limit after entry of the judgment specified in Mississippi Rule of Civil Procedure 59. Consequently, the only procedure available to bring the issue before the court was a Rule 60(b) motion.
¶ 55. The liberal construction of Rule 60(b) to achieve substantial justice is on display here. The chancellor clearly determined that the existing joint custody arrangement was in the children’s best interests. He called the existing joint custody arrangement “ideal” for the children. That arrangement was modified only as a result of Rachel’s anticipated move, which never occurred. Rachel’s expected move presented the only barrier to continuing the “ideal” custody arrangement that the children had enjoyed after their parents’ divorce. Substantial justice requires that the best interests of the children be served by reinstating joint custody.
¶ 56. Rachel’s Rule 60(b) motion was filed within a reasonable time. Rachel did not have a fair opportunity to present the fact that she would not be moving when the case was tried. Then, she was moving to Memphis. The trial was based on the fact that Rachel would live in Memphis, and Tim would live in Jackson.
¶ 57. There were no intervening equities that would trump what the chancellor called the children’s “privilege” and “blessing” of enjoying “two full-time parents who are fully committed to them.”
¶ 58. There is no “justice of the judgment.” These children are now separated from their mother, stepfather, brother, and sister for all but approximately four nights per month. The very thing the chancellor said he wanted to avoid — separating the children from either parent — is now the very thing that has occurred as a result of the judgment. Indeed, this appears to be the majority’s rationale in reversing and remanding the case for further consideration of the visitation rights of Rachel.
¶ 59. This case presents one of, if not the best, example of when Rule 60(b) relief is appropriate. The chancellor clearly found that the existing joint custody arrangement was in the children’s best interests. He also concluded that the Porter children were lucky and that there was no equivalent substitute for the custody arrangement the Porter children had enjoyed thus far. Therefore, if the only reason for modification was Rachel’s anticipated move, and the anticipated move was canceled because of events beyond Rachel’s control after the trial, it seems to *485 me that the best interests of the children could only be served by restoring the children to the advantages that they have enjoyed from having two full-time parents.
¶60. The chancellor’s handling of the Rule 60(b) motion is, in my opinion, the most crucial reason to reverse and remand this case. The chancellor accepted the pleadings and argument of counsel. The more important issues for the chancellor to understand and determine are: (1) whether the relocation did not occur for the reasons Rachel stated, and (2) whether there is such animosity between the parents that the joint physical custody arrangement would no longer work. I am of the opinion that the chancellor abused his discretion in not granting the Rule 60(b) motion, or at least for not having an evi-dentiary hearing on this issue.

(5) Child Support

¶61. Normally, with child custody, child support will be ordered. However, here, the chancellor imposed significant child support obligations on Rachel after the modification. Tim did not petition for a modification of child support.
¶ 62. In Fortenberry v. Fortenberry, 838 So.2d 806, 807 (Miss.1976), the chancellor modified custody and also modified the child support, even though there were no pleadings requesting the modification of the child support. The Mississippi Supreme Court reversed the chancellor, noting that although a chancery court has the power and duty “to make such orders and decrees from time to time as will protect and promote the best interests of the minor children .... due process required that appellant have fair notice from an appropriate pleading that an increase in the amount of the support award was being sought and was under consideration ....” Id.
¶ 63. In Massey v. Huggins, 799 So.2d 902, 910 (¶¶ 32-33) (Miss.Ct.App.2001), this Court held:
Mrs. Massey was not provided notice that she “might be required to defend a claim of child support” nor was there a “suggestion in the record that support payments from [Massey] were even being contemplated by the court on its own or asked for by” Huggins....
We reverse the award of child support.
¶ 64. Here, the chancellor was in error to modify the child support when it was not requested. Rachel had no notice of this claim, and no evidence was presented on the issue by either party. Indeed, Tim did not have a Rule 8.05 financial disclosure before the court. See Unif. Ch. Ct. R. 8.05.
¶ 65. To support a modification of child support, the chancellor should have considered: (a) Rachel’s adjusted gross income; (b) whether a subtraction from Rachel’s adjusted gross income was appropriate under Mississippi Code Annotated section 43-19-101(3)(d) (Rev.2004) (for supporting her other two minor children in her residence); (c) Tim’s adjusted gross income; (d) the cost of the insurance policy Rachel was ordered to provide, or the need for it in light of Tim’s income which exceeds $200,000 per month; (e) the cost of the educational expenses Rachel was ordered to pay; (f) whether application of the child support guidelines was reasonable, as required by Mississippi Code Annotated section 43-19-101(4) (Rev.2004); and (g) the availability and cost of the children’s health insurance, as required by Mississippi Code Annotated section 43-19-101(6) (Rev.2004). Since neither party offered any evidence on these matters, the chancellor had no evidence before him on which to make such findings.

*486
(6) Guardian Ad Litem

¶ 66. The chancellor determined that a guardian ad litem should be appointed. Neither party requested the appointment. The chancellor determined that Allen should be appointed as the children’s guardian ad litem. Allen charged $11,333 for her investigation and report.
¶ 67. Mississippi Code Annotated section 43 — 21—121(l)(f) (Rev.2004) requires the appointment of a guardian ad litem where the court finds “appointment of a guardian ad litem to be in the best interest of the child.” If this was a mandatory appointment, the chancellor was required to itemize the recommendations of the guardian ad litem and to state the reasons in his findings of fact and conclusions of law for not adopting the guardian ad li-tem’s recommendation. S.N.C. v. J.R.D., 755 So.2d 1077, 1082(1118) (Miss.2000); Passmore v. Passmore, 820 So.2d 747, 751(¶ 13) (Miss.Ct.App.2002). Even if this was not a mandatory appointment, the chancellor was required to “include at least a summary review of the qualifications and recommendations of the guardian ad litem in the court’s findings of fact and conclusions of law.” S.N.C., 755 So.2d at 1082(¶ 18).
¶ 68. Here, the chancellor’s words used during the hearing required an explanation. The chancellor repeatedly emphasized the confidence he had in the guardian ad litem and the substantial reliance he would place upon her report and testimony. The chancellor based several pretrial rulings on the confidence he placed in the guardian ad litem and the information that she would be able to provide to the court. For example, the chancellor denied Rachel’s motion for an independent custody evaluation by a court-appointed psychologist on the basis that “the guardian ad litem we’ve got is going to be competent to deal with those issues.”[3] The chancellor granted the plaintiffs motion to strike psychological expert, stating: “That is why I appointed a guardian ad litem so we could do away with dueling experts.” The chancellor allowed the guardian ad litem access to Dr. Mark Webb, and his medical records, even though that information was privileged. Prior to her testimony, the guardian ad litem was referred to by Judge Lutz as the court’s “star witness.”
¶ 69. The guardian ad litem was indeed the “star witness” since she had the opportunity to see, hear, read, and observe things that could not be presented at trial. She interviewed witnesses (such as Jackson City Council member Ben Allen, and local surgeon, Dr. Anke Petro), who were unavailable for trial. She had the unique opportunity of interviewing the children in the homes of both parents. She observed the children interacting with both parents in their respective homes. Allen apparently completed her task in a competent manner. As the children’s guardian ad litem, she testified and made recommendations regarding the children’s best interests. The court referred to her testimony as that of “an expert witness.” This was the only expert opinion offered in the case.
¶ 70. Allen conducted an independent investigation and attended the entire trial. She was called as the court’s witness after both parties had rested. She testified that in her opinion, the best interests of the *487 children would be served by allowing the children to move to Memphis with Rachel, and giving Tim substantial periods of time to visit with the children. Allen testified that the children were happy, well-adjusted, and doing extremely well in the existing custody arrangement. She lamented the fact that any change had to be made. Allen concluded that with Rachel in Memphis, and Tim in Jackson, the children would be better served living in Memphis with Rachel.
¶ 71. The chancellor did not state or explain his reasons for not accepting the recommendation. The chancellor was certainly not required to accept the guardian ad litem’s recommendation. However, in light of the chancellor’s statements in open court, both the parties, and this Court in fulfilling its duty to review the chancellor’s decision, should have been provided the chancellor’s analysis or rationale for this decision. I am of the opinion that this, in and of itself, requires reversal and remand for further proceedings.
¶ 72. For these reasons, I concur in part and dissent in part.
CHANDLER, J., JOINS THIS OPINION.

. These events indicate a significant matter that exists in the lives of divorced parents. Is it better to bring an anticipated change to the chancellor before a decision is made to relocate? Or, is it better for a parent to simply relocate, then tell the other parent what they have done, and then bring the matter to the chancellor for resolution? As a matter of public policy, our domestic relations laws, judgments, and litigants’ agreements should *478 be construed to encourage, if not require, parents to bring matters to the chancellor before any significant change in the children’s lives and the parent’s visitation rights may occur. The practical result of the majority's decision is that in the future a custodial parent or a parent with joint custody, who has the greater visitation rights, may be advised it is in his or her best interest to keep the event, such as a relocation quiet, and move before the other parent becomes aware of it. Neither our laws nor our case interpretations should encourage such action. With changes such as this, we should encourage the parties to discuss the matter and open the courthouse door to resolve a dispute before it tears apart what was otherwise a good and workable custodial and visitation agreement. On the other hand, we do not want parties seeking advisory opinions and then change their mind on relocation based on the chancellor’s decision.

. In my opinion, a denial of a recusal motion should be a matter for prompt interlocutory appeal. The parties should seek to address final resolution of a recusal motion as soon as possible and not simply save the matter as error to be addressed on an appeal after the case is complete. See M.R.A.P. 48B.

. The chancellor denied Rachel’s motion and stressed the confidence he reposed in the guardian ad litem: "I know that separation has an effect on children. And I really think that the guardian ad litem we've got is going to be competent to deal with those issues.... The last thing I need is some semi-shrink getting up here and giving a bunch of academic psychobabble.... I think we always do better getting a lawyer that we know does a good job and really cares about the children.”